# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.1.1
### Eastern Division

True Religion Apparel, Inc., et al.

                          Plaintiff,

v.                                          Case No.: 1:12–cv–09894
                                            Honorable Sharon Johnson Coleman

Does 1–100

                          Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, February 4, 2013:

     MINUTE entry before Honorable Sharon Johnson Coleman: Status hearing held on 2/4/2013. Motion hearing held on 2/4/2013. Plaintiffs' motion for entry of default and for default judgment [38] is granted. Judgment is entered in favor of plaintiffs and against all defendants. Enter Final Judgment Order. Plaintiff's motion to seal Schedule C as attached to the proposed Final Judgment Order [39] is granted. Civil case terminated. Mailed notice(rth, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

1.1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| TRUE RELIGION APPAREL, INC. and GURU DENIM, INC., | ) ) ) | Case No. 12-cv-9894 |
| Plaintiffs, | ) ) | **Judge Sharon Johnson Coleman** |
| v. | ) ) ) | **Magistrate Judge Sidney I. Schenkier** |
| DOES 1-100 d/b/a the aliases identified on Schedule "A", | ) ) ) | |
| Defendants. | ) ) | |

## FINAL JUDGMENT ORDER

This action having been commenced by Plaintiffs True Religion Apparel, Inc. and Guru Denim, Inc. (together, "True Religion") against the Defendants identified in Schedule A to the Complaint and using the Defendant Domain Names;

This Court having entered upon a showing by True Religion, a temporary restraining order and preliminary injunction against Defendants which included a domain name transfer order and asset restraining order;

True Religion having properly completed service of process on Defendants; the combination of providing notice via electronic publication and email, along with any notice that Defendants received from domain name registrars and payment processors, being notice reasonably calculated under all circumstances to apprise Defendants of the pendency of the action and affording them the opportunity to present their objections; and

None of the Defendants having answered the Complaint or appeared in any way, and the time

for answering the Complaint having expired;

THIS COURT HEREBY FINDS that Defendants are liable for federal trademark infringement and counterfeiting (15 U.S.C. § 1114), false designation of origin (15 U.S.C. § 1125(a)), cyberpiracy (15 U.S.C. § 1125(d)) and violation of the Illinois Uniform Deceptive Trade Practices Act (815 ILCS § 510, et seq.).

IT IS HEREBY ORDERED that Plaintiffs' Motion for Entry of Default and Default Judgment is GRANTED in its entirety, that Defendants are deemed in default and that this Final Judgment is entered against Defendants.

IT IS FURTHER ORDERED that:

1. Defendants, their officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be permanently enjoined and restrained from:

    a. using True Religion's TRUE RELIGION Trademarks or any reproduction, counterfeit copy or colorable imitation thereof in any manner in connection with the distribution, advertising, offering for sale, or sale of any product that is not a genuine True Religion product or not authorized by True Religion to be sold in connection with True Religion's TRUE RELIGION Trademarks;

    b. passing off, inducing, or enabling others to sell or pass off any product as a genuine TRUE RELIGION product or any other product produced by True Religion, that is not True Religion's or not produced under the authorization, control or supervision of True Religion and approved by True Religion for sale under True Religion's TRUE RELIGION Trademarks;

c. committing any acts calculated to cause consumers to believe that Defendants' products are those sold under the authorization, control or supervision of True Religion, or are sponsored or approved by, or connected with True Religion;

d. further infringing True Religion's TRUE RELIGION Trademarks and damaging True Religion's goodwill;

e. otherwise competing unfairly with True Religion in any manner;

f. shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for True Religion, nor authorized by True Religion to be sold or offered for sale, and which bear True Religion's TRUE RELIGION Trademarks or any reproduction, counterfeit copy or colorable imitation thereof;

g. using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Domain Names or any other domain name that is being used to sell counterfeit TRUE RELIGION products; and

h. operating and/or hosting websites at the Defendant Domain Names and any other domain names registered or operated by Defendants that are involved with the distribution, advertising, offering for sale, or sale of any product that is not a genuine TRUE RELIGION product or not authorized by True Religion to be sold in connection with True Religion's TRUE RELIGION Trademarks.

2.    The Defendant Domain Names are permanently transferred to True Religion's control.  The domain name registries for the Defendant Domain Names, namely VeriSign, Inc., Neustar, Inc., Afilias Limited and the Public Interest Registry, within five (5) business days of receipt of this Order, shall unlock and change the registrar of record for the Defendant Domain Names to a registrar of

True Religion's selection, and the domain name registrars shall take any steps necessary to transfer the Defendant Domain Names to True Religion's account at a registrar of True Religion's selection.

3.  Those in privity with Defendants and with notice of the injunction, including any Internet search engines, web hosts, domain-name registrars and domain name registries that are provided with notice of the injunction, shall cease facilitating access to any and all websites through which Defendants engage in the sale of counterfeit and infringing goods using the TRUE RELIGION Trademarks.

4.  Pursuant to 15 U.S.C. § 1117(c)(2), True Religion is awarded statutory damages from each of the Defendants in the amount of two million dollars ($2,000,000) for willful use of a counterfeit TRUE RELIGION Trademark on products sold through at least the Defendant Domain Names for a total award in the amount of two hundred million dollars ($200,000,000);

5.  Any banks, savings and loan associations, payment processors, PayPal or other financial institutions, for any Defendant or any of Defendants' websites shall within two (2) business days of receipt of this Order:

    a.  Locate all accounts connected to Defendants, Defendants' Marketplace Accounts or Defendants' websites, including, but not limited to, any PayPal accounts connected to the email addresses listed in Schedule C hereto;

    b.  Restrain and enjoin such accounts from transferring or disposing of any money or other of Defendants' assets; and

6.  All monies currently restrained in Defendants' financial accounts, including monies held by PayPal, Inc. ("PayPal"), are hereby released to True Religion as partial payment of the above-identified damages, and PayPal is ordered to release to True Religion the amounts from Defendants' PayPal accounts within ten (10) business days of receipt of this Order.

7.    Until True Religion has recovered full payment of monies owed to it by any Defendant, True Religion shall have the ongoing authority to serve this Order on any banks, savings and loan associations, or other financial institutions including, without limitation, PayPal, (collectively, the "Financial Service Providers") in the event that any new financial accounts controlled or operated by Defendants are identified. Upon receipt of this Order, the Financial Service Providers shall immediately:

    a.  Locate all accounts connected to Defendants, Defendants' Marketplace Accounts or Defendants' websites, including, but not limited to, any PayPal accounts; and

    b.  Restrain and enjoin such accounts from transferring or disposing of any money or other of Defendants' assets, and any funds in such accounts shall be transferred to True Religion within ten (10) business days of receipt of this Order.

8.    In the event that True Religion identifies any additional domain names or financial accounts owned by Defendants, True Religion may send notice of any supplemental proceeding to Defendants by email at the email addresses identified in Schedule A to the Complaint.

9.    The ten thousand dollar ($10,000) bond including any interest minus the registry fee is hereby released to True Religion.

This is a Final Judgment.

DATED: February 6, 2013

_____

Sharon Johnson Coleman

U.S. District Court Judge

Order Form (01/2005)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 11 C 10 | **DATE** | 10/14/2011 |
| **CASE TITLE** | Deckers Outdoor Corporation vs. Does 1 - 55 | | |

**DOCKET ENTRY TEXT**

For the reasons stated in the attached memorandum opinion and order, Deckers' motion for entry of default and motion for entry of a default judgment is granted in its entirety [58]. Enter Memorandum Opinion and Order. Civil case closed.

■ [ For further detail see separate order(s).]

Docketing to mail notices.
*Mail AO 450 form.

Courtroom Deputy Initials: MF

U.S. DISTRICT COURT
CLERK
2011 OCT 17 AM 6: 16
FILED-EOT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DECKERS OUTDOOR               )
CORPORATION,                  )
                              )
            Plaintiff,        )
                              )
    v.                        )     Case No. 11 C 10
                              )
DOES 1-55 d/b/a the aliases identified on  )     Judge John W. Darrah
Schedule A and DOES 56-500,   )
                              )
            Defendants.       )

## MEMORANDUM OPINION AND ORDER

Before the Court is Deckers Outdoor Corporation's ("Deckers") Motion for Entry

of Default and Entry of Default Judgment pursuant to Fed. R. Civ. P. 55(b)(2) against

Defendants, Does 1-55 d/b/a the aliases identified on Schedule A to Deckers' Amended

Complaint (collectively, "the Defendants") based on Deckers' action for trademark

infringement and counterfeiting.

Deckers is known as a source of high quality footwear products, including the

UGG® (the "UGG Trademark") brand of premium sheepskin footwear.

Deckers filed this action on January 3, 2011, alleging federal trademark

infringement and counterfeiting (Count I), false designation of origin (Count II),

cyberpiracy (Count III) and violation of the Illinois Uniform Trade Practices Act

(Count IV), and seeks statutory damages and injunctive relief. (Dkt. No. 5.) On the same

day, Deckers filed an *ex parte* application for entry of a temporary restraining order and

preliminary injunction. (Dkt. No. 49.) The Court granted Deckers' motion for a

temporary restraining order on February 3, 2011 (*see* Dkt. No. 26), and converted the

temporary restraining order to a preliminary injunction on March 8, 2011 (*see* Dkt. No. 37).

On May 24, 2011, the Court denied Deckers' Motion for Entry of Default Judgment on the basis that Deckers had not established that the Court has personal jurisdiction over Does 1-55, consistent with the requirements recently set forth by the Seventh Circuit in *be2 LLC v. Ivanov*, 642 F.3d 555 (7th Cir. 2011). (*See* Dkt. No. 50.)

Deckers filed an Amended Complaint on August 17, 2011. (Dkt. No. 56.) Deckers included newly discovered domain names linked to websites operated by Defendants and added new allegations relating to Defendants' illegal activities that were directed toward Illinois. (*See id.*) The Amended Complaint was served electronically on all Defendants on August 17, 2011. (*Id.*) None of the Defendants has entered an appearance or otherwise defended this action since being notified of this Action in February 2011. The time for responding to the Amended Complaint expired on August 31, 2011, pursuant to Fed. R. Civ. P. 15(a)(3).

In its Motion for Default Judgment pursuant to Rule 55(b)(2), Deckers seeks the entry of an Order, finding that each of the Defendants are liable on all counts of Deckers' Amended Complaint. Deckers further seeks an award of statutory damages pursuant to 15 U.S.C. § 1117(c)(2) for willful trademark counterfeiting against each of the 49 Defendants[1] in the amount of up to $2,000,000 per Defendant for use of a counterfeit UGG Trademark on products sold through each of the 271 Defendant Domain Names. Deckers also seeks an award of statutory damages pursuant to 15 U.S.C. §1117(d) of up

---

[1] Each unique registrant e-mail address is counted as a separate Defendant. The Defendant Domain Names identified are registered using 49 unique email addresses.

to \$100,000 for each of the 140 Defendant Domain Names that incorporate Deckers' UGG Trademark. Deckers further seeks entry of a permanent injunction, prohibiting Defendants from selling products containing counterfeit UGG Trademarks, an order that domain names used by Defendants to sell products containing counterfeit UGG trademarks be permanently transferred to Deckers, and that all assets in Defendants' financial accounts operated by PayPal, Inc. ("PayPal") be transferred to Deckers, including the approximately \$130,617 identified by Deckers.

## ANALYSIS

### *Entry of Default and Default Judgment*

Deckers has met its burden of making a *prima facie* case for personal jurisdiction over Defendants. *See uBID, Inc. v. GoDaddy Group Inc.*, 623 F.3d 421, 423 (7th Cir. 2010); *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 599 (7th Cir. 2007). Because Defendants have chosen not to appear or produce any evidence regarding their illegal activities in Illinois, the allegations in the Amended Complaint, which must be accepted as true, establish a *prima facie* case for personal jurisdiction against each Defendant. (*See* Am. Compl. ¶¶ 2, 4, 8, 9 and 11-17.) *See Purdue Research Found. v. Sanofi-Sythelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) ("When determining whether a plaintiff has met his burden, jurisdictional allegations pleaded in the complaint are accepted as true unless proved otherwise by defendants' affidavits or exhibits.").

Deckers has pled that each of the Defendants has targeted and solicited sales from Illinois residents by operating English language websites that offer shipping to Illinois, has accepted payment in U.S. dollars, and has sold counterfeit UGG products to residents of Illinois. *See The Gen. Council of the Assemblies of God v. The Ranger Supply Store,*

3

*Inc. et al.*, No. 10 C 07050 (N.D. Ill. June 29, 2011) (entering default judgment against defendants who sold counterfeit products to Illinois residents through an Internet website) (*General Council*).

Pursuant to Rule 55(a) of the Federal Rules of Civil Procedure, "when a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P 55(a). "Although Rule 55(a) . . . refers to entry of default by the clerk, it is well-established that a default also may be entered by the court." *Breuer Elec. Mfg. Co. v. Toronado Sys. of Am., Inc.*, 687 F.2d 182, 185 (7th Cir. 1982). When motion is made to the court for entry of a default, the decision to enter default lies within the district court's discretion. *O'Brien v. R.J. O'Brien & Assocs., Inc.*, 998 F.2d 1394, 1398 (7th Cir. 1993).

The Defendants were properly served on August 17, 2011. (*See* Dkt. No. 60, Gaudio Decl. at ¶ 15, Ex. 14). Despite having been served with process, the Defendants have ignored these proceedings and failed to plead or otherwise defend this action. (*Id.* at ¶ 16). Therefore, Deckers has met the requirements for entry of default against the Defendants pursuant to Rule 55(a).

Rule 55(b)(2) of the Federal Rules of Civil Procedure provides for a court-ordered default judgment. A default judgment establishes, as a matter of law, that Defendants are liable to Plaintiff on each cause of action alleged in the complaint. *United States v. Di Mucci*, 879 F.2d 1488, 1497 (7th Cir. 1989). When the Court determines that a defendant is in default, the factual allegations of the Complaint – except those relating to damages – are taken as true and may not be challenged and the

4

defendants are liable as a matter of law as to each cause of action alleged in the complaint. Fed. R. Civ. P. 8(b)(6); *Black v. Lane*, 22 F.3d 1395, 1399 (7th Cir. 1994).

Deckers has therefore shown the following:

1. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391. Deckers' investigation has shown that Defendants have set up fully interactive commercial Internet websites, operating under the 271 domain names, which are identified in Schedule A attached to Deckers' Amended Complaint and Schedule B attached to Deckers' Memorandum in Support of its Motion for Default Judgment, Docket Number 64 (collectively, the "Defendant Domain Names"). (Am. Compl. ¶ 2.) Through these Domain Names, Defendants have targeted and solicited sales from Illinois residents by operating English language websites that offer shipping to Illinois, have accepted payment in U.S. dollars and, on Deckers' information and belief, have sold counterfeit UGG products to residents of Illinois. (*Id.*) Each of the Defendants is committing tortuous acts in Illinois, is engaging in interstate commerce and has wrongfully caused Deckers substantial injury in the State of Illinois. (*Id.*)

3. Deckers is famous throughout the United States and elsewhere as a source of high quality footwear products, including the UGG® brand of premium sheepskin footwear. (*Id.* ¶ 4.) Deckers' UGG products are distributed and sold to consumers through retailers throughout the United States, including through over 100 authorized retailers in Illinois, the uggaustralia.com website, and UGG

5

Concept Stores, including a Concept Store located at 909 North Rush Street in Chicago, Illinois. (*Id.*)

4. Since acquiring the UGG Trademark and the goodwill of the business in 1995, Deckers has continuously sold footwear and clothing under the UGG Trademark. (*Id.* ¶ 5.) Deckers has built substantial goodwill in the UGG Trademark and the UGG Trademark, is famous and a valuable asset of Deckers. (*Id.*)

5. Deckers holds registrations for the UGG Trademark (and stylized variations) in more than 100 countries around the world, including U.S. Trademark Registration No. 3,050,925. (*Id.* ¶ 6.) The UGG Trademark has been used continuously since as early as 1979 by Deckers and its predecessors in interest. (*Id.*) The registration is valid and subsisting. (*Id.*)

6. The UGG Trademark is distinctive when applied to high quality apparel, footwear and related merchandise, signifying to the purchaser that the products come from Deckers and are manufactured to the highest quality standards. (*Id.* ¶ 7.) Whether Deckers manufactures the products itself or licenses others to do it, Deckers has insured that products bearing its trademarks are manufactured to the highest quality standards. (*Id.*) Deckers' products branded under the UGG Trademark have been widely accepted by the public and are enormously popular, as demonstrated by hundreds of millions of dollars in sales each year. (*Id.*) The UGG Trademark is a famous mark. (*Id.*)

7. Defendants are unknown individuals and business entities who, upon the information and belief of Deckers, reside in the People's Republic of China or other foreign jurisdictions with lax trademark enforcement legal systems.

(*Id.* ¶ 8.) Defendants conduct business throughout the United States, including within the State of Illinois and this Judicial District, through the operation of the fully interactive commercial websites operating under the Defendant Domain Names. (*Id.*)

8. Defendants are directly and personally contributing to, inducing, and engaging in the sale of counterfeit products bearing UGG Trademarks. (*Id.* ¶ 9.) The counterfeit products for sale on the Defendant Domain Names bear similar irregularities and indicia of being counterfeit to one another, indicating that the counterfeit products were manufactured by and come from a common source and that Defendants are interrelated. (*Id.*) In addition, the websites linked to Defendant Domain Names include multiple similarities, such as the same page layout, text, and copyright protected images copied from Deckers' uggaustralia.com website. (*Id.*)

9. Defendants are liable on all counts of Deckers' Amended Complaint, specifically for trademark infringement (*see* Dkt. No. 56 at ¶¶ 18-24); false designation of origin (*id.* at ¶¶ 25-29); cybersquatting (*id.* at ¶¶ 30-35); and violation of the Illinois Deceptive Trades Practices Act (*id.* ¶¶ 36-29).

*Statutory Damages*

As set forth above, Defendants are liable for violations of the Lanham Act. Consequently, Deckers first moves for statutory damages pursuant 15 U.S.C. § 1117(c)(2), for willful trademark counterfeiting against each of the 49 Defendants in the amount of up to $2,000,000 per Defendant for use of a counterfeit UGG Trademark, pursuant to 15 U.S.C. § 1117(d).

The Lanham Act allows a plaintiff to elect, at any time before final judgment is rendered, one of two alternative recovery options for trademark infringement: (1) the actual damages caused by the infringement, 15 U.S.C. § 1117(a); or (2) statutory damages, 15 U.S.C. § 1117(c). Courts commonly find statutory damages appropriate in default judgment cases because the information needed to prove actual damages is within the infringers' control and is not disclosed. *See Microsoft Corp. v. McGee*, 490 F. Supp. 2d 874 (S.D. Ohio 2007); *Chanel, Inc. v. French*, No. 05-61838, 2006 WL 3826780, *2 (S.D. Fla. Dec. 27, 2006); *PetMed Express, Inc. v. MedPets.Com, Inc.*, 336 F. Supp. 2d 1213, 1220 (S.D. Fla. 2004); *Tiffany Inc. v. Luban*, 282 F. Supp. 2d 123, 123 (S.D.N.Y. 2003); *Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494 (C.D. Cal. 2003); *Sara Lee Corp. v. Bags of New York*, 36 F. Supp. 2d 161, 165 (S.D.N.Y. 1999).

Section 1117(c)(1) allows statutory damages of "not less than $1,000 and no more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c)(1). "If the court finds that the use of the counterfeit mark was willful," Section 1117(c)(2) allows a statutory damages award of up to $2,000,000 per counterfeit mark. 15 U.S.C. § 1117(c)(2).

"Willful infringement may be attributed to the defendant's actions where he had knowledge that his conduct constituted infringement or where he showed a reckless disregard for the owner's rights." *Lorillard Tobacco Co. v. S&M Cent. Service Corp.*, No. 03 C 4986, 2004 WL 2534378, *7 (N.D. Ill. Nov. 8, 2004) (*Lorillard Tobacco Co.*). As such, knowledge need not be proven directly but can be inferred from a defendant's conduct. *Id.* Willful infringement may be shown by the fact that the "defendant ignored

8

the plaintiff's notices[,] did not seek advice of an attorney, and passed the matter off as a nuisance." *Id.*

Deckers has sufficiently demonstrated that Defendants' use of the UGG Trademark was willful. (*See* Am. Compl. ¶¶ 9, 12.) Under circumstance similar to those presented here, in *General Council*, the district court deemed defendants' use of plaintiff's trademark willful where the defendants were in default. (*See* 6/29/11 Order, Dkt. No. 47, *General Council*, No. 10-cv-7050.) *See also Tiffany (NJ) Inc. v. Luban*, 282 F. Supp. 2d 123, 124 (S.D.N.Y. 2003).

While § 1117(c) sets out a dollar range for possible statutory damage awards, the statute does not provide guidance on how to select a damage figure within that range. Courts assessing statutory damages under § 1117(c) have looked to case law applying the statutory damage provision of the Copyright Act, 17 U.S.C. § 504(c), for guidance. *See Lorillard Tobacco Co.*, 2004 WL 2534378 at *4. Addressing 17 U.S.C. § 504(c) in *Chi Boy Music v. Charlie Club.*, 930 F.2d 1229 (7th Cir. 1991) (*Chi-Boy Music*), the Seventh Circuit held that a court awarding statutory damages is "not required to follow any rigid formula but instead enjoys wide discretion."

An award of statutory damages serves dual interests in that it is remedial in nature but also intended to protect an important public interest. *Sands, Taylor & Wood v. The Quaker Oats Co.*, 34 F.3d 1340, 1348 (7th Cir. 1994). As such, the remedy imposed under statute must provide sufficient deterrent effect to ensure that the guilty party will not engage in further infringing conduct. *Id.* Statutory damages are appropriate to "penalize the infringer and deter future violations" when the infringement is willful. *Lorillard Tobacco Co.*, 2004 WL 2534378 at *4 (quoting *Chi Boy Music*, 930 at 1230).

9

Deckers requests an award up to the maximum statutory damages award authorized by 15 U.S.C. § 1117(c)(2) for willful trademark counterfeiting against each of the 49 Defendants in the amount of $2,000,000 per Defendant, which totals $98,000,000. Elsewhere in its Motion, Deckers notes that this case is "virtually identical to the facts" in *General Council* (Mem. at 11), which involved a non-Illinois trademark owner suing non-Illinois based Defendants for selling counterfeit products to Illinois residents over an Internet website.

In *General Council*, the district court entered an order for default judgment on the plaintiff's claims, among them trademark infringement and copyright infringement. In its motion for default judgment, plaintiff requested $2,000,000 per counterfeit mark. Holding that defendants' use of the trademark was willful, the court awarded $750,000 per infringing use of counterfeit marks. Based on the similarities between the cases, such a statutory award is reasonable and will be applied here. Plaintiff is awarded $750,000 against each of the 49 Defendants for use of a counterfeit UGG Trademark, for a total of $36,750,000.

Second, Deckers moves for statutory damages pursuant to 15 U.S.C. § 1117(d) on the grounds that Defendants violated Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d). 15 U.S.C. § 1117(d) provides that:

> In a case involving a violation of section 1125(d)(1) of this title, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just.

Deckers requests statutory damages of up to $100,000 for each of the 140 Defendant Domain Names that incorporate Deckers' UGG Trademark.

10

An award of $50,000 per domain name, for each of the 140 Defendant Domain Names that incorporate Deckers' UGG Trademark, for a total of $7,000,000, is reasonable and consistent with *General Council*, which, as discussed above, involved similar circumstances. (*See* 6/29/11 Order, Dkt. No. 47, *General Council*, No. 10-cv-7050 (awarding $50,000 per domain name under 15 U.S.C. § 1117(d) where plaintiff requested $100,000 per domain name).)

## CONCLUSION

It is hereby ordered that Deckers' Motion for Entry of Default and Motion for Entry of a Default Judgment is granted in its entirety and that Defendants, d/b/a the aliases identified on Schedule A to Deckers' Amended Complaint are deemed in default; and this Final Judgment is entered against Defendants.

It is further ordered:

1.  Defendants, their officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be temporarily, preliminarily and permanently enjoined and restrained from:

    a.  using Deckers' UGG Trademark or any reproductions, counterfeit copy or colorable imitation thereof in any manner in connection with the distribution, advertising, offering for sale, or sale of any product that is not a genuine Deckers' UGG branded product or not authorized by Deckers to be sold in connection with Deckers' UGG Trademark;

11

b.    passing off, inducing, or enabling others to sell or pass off any product as a genuine UGG branded product or any other product produced by Deckers, that are not Deckers' or not produced under the authorization, control or supervision of Deckers and approved by Deckers for sale under Deckers' UGG Trademark;

c.    committing any acts calculated to cause consumers to believe that Defendants' products are those sold under the authorization, control or supervision of Deckers, or sponsored or approved by, or connected with Deckers;

d.    further infringing Deckers' UGG Trademark and damaging Deckers' goodwill;

e.    otherwise competing unfairly with Deckers in any manner;

f.    shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Deckers, nor authorized by Deckers to be sold or offered for sale, and which bear any Deckers' UGG Trademark or any reproductions, counterfeit copy or colorable imitation thereof;

g.    using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Domain Names or any other domain name that is being used to sell counterfeit UGG products; and

12

h.      operating and/or hosting websites at the Defendant Domain Names and any other domain names registered or operated by Defendants that are involved with the distribution, advertising, offering for sale, or sale of any product that is not a genuine Deckers' UGG branded product or not authorized by Deckers to be sold in connection with Deckers' UGG Trademark.

2.      The registrars and registries for the Defendant Domain Names, namely VeriSign, Inc., Neustar, Inc. and the Public Interest Registry are required to:

a.      prevent the Defendant Domain Names from linking to corresponding counterfeit websites; and

b.      at Deckers' election, transfer to Deckers' control or cancel the Defendant Domain Names and any other domain names owned by Defendants, including any domain names registered using the registrant email addresses listed below, that have been identified as being used to engage in their counterfeiting of the UGG Trademark.

3.      Those in privity with Defendants and those with notice of the injunction, including any Internet search engines, web hosts, domain-name registrars and domain name registries that are provided with notice of the injunction, cease facilitating access to any and all websites through which Defendants engage in the sale of counterfeit and infringing goods using the UGG Trademark;

13

4.     That pursuant to 15 U.S.C. § 1117(c)(2), Deckers is awarded statutory damages from each of the 49 Defendants in the amount of seven-hundred-fifty-thousand dollars ($750,000) for use of a counterfeit UGG Trademark on products sold through at least the Defendant Domain Names, for a total award in the amount of thirty-six million seven-hundred-fifty thousand dollars ( $36,750,000).

5.     That pursuant to 15 U.S.C. § 1117(d), Deckers is awarded statutory damages for each the 140 Defendant Domain Names that incorporate the UGG Trademark in the amount of fifty thousand dollars ($50,000), for a total award in the amount of seven million dollars ($7,000,000).

6.     That pursuant to 15 U.S.C. § 1117(a), Deckers is awarded reasonable attorney's fees.

7.     That all monies currently restrained in Defendants' financial accounts, including monies held by PayPal, are hereby released to Deckers as partial payment of the above-identified damages; and PayPal is ordered to release to Deckers said amounts from Defendants' PayPal accounts within ten (10) business days of receipt of this Order.

Date:  _10 . 14 . 11_

JOHN W. DARRAH
United States District Court Judge

14

Case No. 11-CV-118
UNITED STATES DISTRICT COURT EASTERN DISTRICT OF WISCONSIN

# Nordock, Inc. v. Sys., Inc.

Decided Nov 21, 2017

Case No. 11-CV-118

11-21-2017

NORDOCK, INC., Plaintiff, v. SYSTEMS, INC., Defendant.

---

WILLIAM E. DUFFIN U.S. Magistrate Judge

## DECISION AND ORDER

### I. Facts and Procedural History

Nordock, Inc. holds a design patent regarding a "lip and hinge plate for a dock leveler." U.S. Patent No. D579,754 (the 'D754 Patent). When a semi-trailer is backed into a loading dock, a dock leveler bridges the gap between the floor of a loading dock and the bed of a semi-trailer. (ECF Nos. 258-1, ¶ 5; 221 at 17.) A dock leveler allows people and equipment such as forklifts to easily pass between the building and the trailer when loading or unloading cargo onto or from the trailer. (*Id.*)

The lip and hinge plate is the portion of the dock leveler that actually spans any gap between the building and the trailer and makes contact with the trailer bed. (*See* ECF Nos. 164 at 12, 13, 22-23, 64; 221 at 15.) When not in use, the lip normally hangs *2 down perpendicular to the deck of the dock leveler; when in use, it comes up to be generally parallel with the deck. (ECF No. 164 at 23.)

Nordock filed this action alleging that Systems, Inc. was selling products that infringed the 'D754 Patent. On March 26, 2013, the jury returned a verdict in favor of Nordock. (ECF No. 172.) Concluding that Systems had no profit on the sales

of its infringing dock levelers, the jury awarded Nordock $46,825 as a reasonable royalty. (ECF No. 172 at 3.)

Both sides appealed. The Court of Appeals for the Federal Circuit concluded that there was no evidence to support the jury's conclusion that Systems did not have any profit on the sales of its infringing dock levelers, *Nordock, Inc. v. Sys., Inc.*, 803 F.3d 1344, 1356 (Fed. Cir. 2015), and remanded the matter for a new trial on damages. *Id.* The Federal Circuit stated that at that new trial damages under 35 U.S.C. § 289 must be based on the profit from the sale of the entire dock leveler and not just the profit attributable to the lip and hinge plate. *Nordock*, 803 F.3d at 1355.

The United States Supreme Court granted Systems's request for review, summarily reversed, and remanded the case to the Federal Circuit in light of its recent decision in *Samsung Elecs. Co. v. Apple Inc.*, 137 S. Ct. 429, 196 L.Ed.2d 363 (2016). *Sys., Inc. v. Nordock, Inc.*, 137 S. Ct. 589, 196 L.Ed.2d 471 (2016).

In *Samsung* Apple alleged that Samsung infringed its design patents for mobile phones. The design patents covered "a rectangular front face with rounded edges and a *3 grid of colorful icons on a black screen." *Id.* at 431. A jury found that several Samsung smartphones infringed Apple's design patents and awarded Apple nearly $400 million in damages--the entire profit Samsung made from its sales of the infringing smartphones.

On appeal Samsung argued "that the profits awarded should have been limited to the infringing 'article of manufacture'" (for example,

the case of the Samsung smartphone) and not the entire smartphone. *Apple Inc. v. Samsung Elecs.Co.*, 786 F.3d 983, 1002 (2015). The Federal Circuit rejected that argument, reasoning that limiting the damages award in this manner was not appropriate because the "innards of Samsung's smartphones were not sold separately from their shells as distinct articles of manufacture to ordinary purchasers." *Id*.

The Supreme Court disagreed with the Federal Circuit's conclusion that the article of manufacture must always be the product sold to consumers. It concluded that the term "article of manufacture" as used in § 289 "encompasses both a product sold to a consumer and a component of that product." *Samsung*, 137 S. Ct. at 434. However, the Supreme Court did not articulate how a court is to identify the "article of manufacture."

Following the Supreme Court's decision remanding *Nordock* to the Federal Circuit, *Systems*, 137 S. Ct. 589, the Federal Circuit in a brief per curiam opinion remanded the case to this court for a new trial on damages. *Nordock, Inc. v. Sys., Inc.*, 681 F. App'x 965 (Fed. Cir. 2017). The Federal Circuit stated, "The trial court will also *4 have the opportunity to consider the parties' arguments with respect to the relevant 'article of manufacture' in the first instance." *Id*. at 966.

Following the death of the prior presiding judge, the case was randomly assigned to this court. All parties consented to this court's jurisdiction. Thus, it is now for this court to decide how the article of manufacture should be determined. The issue comes before the court on the parties' cross motions for partial summary judgment.

## II. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Factual disputes are 'material' only when they 'might affect the outcome of the suit under the

governing law'" and "'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the [nonmovant].'" *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 610 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The burden on the moving party may be discharged by demonstrating 'that there is an absence of evidence to support the nonmoving party's case.'" *Id*. (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016). *5

In support of its motion for summary judgment Nordock submitted 75 proposed findings of fact (ECF No. 258-1) supported by voluminous documentation (ECF Nos. 258-3 — 261-15; 268-1 — 268-9; 266-1 — 266-3). Systems requested "that it be relieved from responding to each of Nordock's proposed statements of fact at this time and that, if the Court believes Nordock's statements are material or otherwise potentially dispositive, it be given a meaningful opportunity to depose these witnesses before responding specifically and individually to each of these statements under Local Rule 56(b)(2)(B)." (ECF No. 269 at 11.) Given the posture of this case and the context of the present dispute, where the foremost issue is determining the test that should apply for identifying the article of manufacture, the court grants this unusual request. Many of Nordock's proposed findings of fact are not material. Others are not properly proposed findings of fact but rather represent legal conclusions. And others are not properly supported by appropriate citations. Of those material proposed findings of fact that are properly presented, the court does not find that any is reasonably subject to dispute. Therefore, as

referenced below, the court will consider certain of the relevant proposed findings of fact for purposes of this motion.

### III. Analysis

### a. Burden

Systems argues that, in the absence of clarification from the Supreme Court or the Federal Circuit as to which party bears the burden of proof on what constitutes the *6 article of manufacture, "the ordinary rule that a plaintiff bears the initial burden of proof on all issues, including the issue of damages, should not be disturbed." (ECF No. 262 at 9.) Nordock argues that it should be presumed that the article of manufacture is the product that is sold, and the burden should be placed on the alleged infringer to prove that the article of manufacture is something less than the entire product. (ECF No. 258 at 18.)

The parties refer to the "burden of proof," but that term can encompass both the burden of persuasion and the burden of production. *Cf. Director v. Greenwich Collieries*, 512 U.S. 267, 272 (1994). For the sake of clarity, the court will refer to these concepts separately.

The plaintiff normally bears the burden of persuasion on all issues, including damages. *See Schaffer v. Weast*, 546 U.S. 49, 56 (2005); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009); *Smithkline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1164 (Fed. Cir. 1991). The identification of the article of manufacture is part and parcel to damages under § 289. Thus, the court concludes that the plaintiff bears the burden of persuasion with respect to identifying the article of manufacture and proving the defendant's total profit from that article of manufacture. *Apple*, 2017 U.S. Dist. LEXIS 177199, at *90.

However, once the plaintiff meets its initial burden of production with respect to the article of manufacture and the defendant's total profit on that article, if the *7 defendant contends that the

article of manufacture is something else, the defendant has the burden to produce evidence as to this alternative article of manufacture. The defendant also has the burden to produce evidence as to any deductions it believes are appropriate from the total profit identified by the plaintiff. *Apple*, 2017 U.S. Dist. LEXIS 177199, at *96-97 (citing *Henry Hanger & Display Fixture Corp. of Am. v. Sel-O-Rak Corp.*, 270 F.2d 635, 643 (5th Cir. 1959); *Rocket Jewelry Box, Inc. v. Quality Int'l Packaging, Ltd.*, 250 F. Supp. 2d 333, 341 (S.D.N.Y. 2003) *vacated in part on other grounds*, 90 F. App'x 543 (Fed. Cir. 2004) (unpublished); *Bergstrom v. Sears, Roebuck & Co.*, 496 F. Supp. 476, 497 (D. Minn. 1980).

Although § 289 does not explicitly impose any burden on the defendant, this shift in the burden of production is consistent with the disgorgement of profits in other contexts. *See SEC v. First City Fin. Corp.*, 281 U.S. App. D.C. 410, 890 F.2d 1215, 1232 (1989); *SEC v. Teo*, 746 F.3d 90, 112 (3d Cir. 2014) ("When the SEC comes forward with a reasonable approximation of tainted profits, the burden of production then shifts to the defendant to produce evidence showing that all or some part of the sum in question should not be subject to disgorgement."). Similar burden shifting is countenanced with respect to lost profits under § 284. *See Apple*, 2017 U.S. Dist. LEXIS 177199, at *95 (discussing *Micro Chem., Inc. v. Lextron*, Inc., 318 F.3d 1119, 1122 (Fed. Cir. 2003)).

Moreover, this shift in the burden of production is appropriate because, as the United States noted when endorsing this approach as amicus curiae in *Samsung*: *8

Nordock, Inc. v. Sys., Inc.     Case No. 11-CV-118 (E.D. Wis. Nov. 21, 2017)

The defendant, as the manufacturer or seller of the accused product, has superior knowledge of the identity of the product's components, as well as of some of the factors relevant to the "article" determination, including the physical relationship between the design and the product; the manner in which the product is manufactured; and the extent to which the product reflects the innovations of parties other than the plaintiff. See *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 494 n.17 (2004) (placement of burden of production may turn on which party has "peculiar means of knowledge" of the facts in question) (citation omitted); accord *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 851 (2014).

*Samsung Electronics Co., Ltd. v. Apple Inc.*, Brief for the United States as Amicus Curiae Supporting Neither Party, 2016 WL 3194218, 30-31, 2016 U.S. S. Ct. Briefs LEXIS 2322, 50-51 (hereafter, Amicus).

In sum, the court finds that the approach taken by the district court on remand in *Samsung* is correct.

The plaintiff bears the burden of persuasion in proving the relevant article of manufacture and in proving the amount of defendant's total profit under § 289. The plaintiff also bears an initial burden of production on both of these issues. However, once the plaintiff satisfies its initial burden of production, the burden of production shifts to the defendant to come forward with evidence to support any alternative article of manufacture and to prove any deductible expenses.

*Apple*, 2017 U.S. Dist. LEXIS 177199, at *98-99.

**b. Method for Identifying the Article of Manufacture**

In *Samsung* the United States as amicus curiae proposed a four factor test for purposes of determining the article of manufacture: (1) the scope of the design claimed in the patent, including the drawing and written description; (2) the relative *9 prominence of the design within the product as a whole; (3) whether the design is conceptually distinct from the product as a whole; and (4) the physical relationship between the patented design and the rest of the product. Amicus at 27-29; 2016 U.S. S. Ct. Briefs LEXIS 2322 at 46-48. Systems argues that the court should apply this test. (ECF No. 262 at 6.)

Nordock contends that the "totality of the circumstances" test crafted by the United States is ineffective when applied to products that, unlike mobile phones, do not perform a broad range of functions. (ECF No. 258 at 21.) It argues that the analysis should begin with a presumption that the article of manufacture is the entire product sold by the infringer; a totality of the circumstances test should be applied only if certain threshold questions indicate that it is appropriate. (ECF No. 258 at 20-25.)

If a totality of the circumstances test is appropriate, Nordock proposes considering a far broader list of factors: whether the design patent identified the finished product to which it applied; whether the design element was sold as part of a larger, complete product; whether the design is seen together with other components when offered for sale; whether the infringer prominently displayed the design element in its sales materials; whether the portion to which the design element applied was necessary to perform the intended purpose of the overall product; whether the overall product performed a broad range of functions; whether the portion to which the design element applied was sold separately from the overall product; whether the design *10 patent referred to other patents for the overall product; whether the design patent is a continuation of a utility patent claiming the entire overall product; whether a designer would need to consider the overall

product to apply the design element; whether the infringer was aware of the design patent before it began selling the infringing product; whether it is possible to accurately identify the infringer's profits from the overall product; and whether it is possible to accurately identify the infringer's profits from the portion of the overall product to which the design element applied. (ECF No. 258 at 26-30.)

Nordock's position rests in part on a misreading of § 289. Section 289 states:

> Whoever during the term of a patent for a design, without license of the owner, (1) applies the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale, or (2) sells or exposes for sale any article of manufacture to which such design or colorable imitation has been applied shall be liable to the owner to the extent of his total profit, but not less than $ 250, recoverable in any United States district court having jurisdiction of the parties.

35 U.S.C. § 289. Nordock contends that the phrase "for the purpose of sale" describes the "article of manufacture," suggesting that the article of manufacture is whatever is sold. (ECF No. 258 at 16.) Aside from the fact that this is essentially the conclusion rejected by the Supreme Court in *Samsung*, the phrase "for the purpose of sale" does not modify "article of manufacture" but rather modifies the entire phrase, "applies the patented design...to any article of manufacture[.]" Thus, it describes what a person must do to violate § 289. A person who, without license, "applies the patented design *11 ... to any article of manufacture" but does not do so "for the purpose of sale" does not violate § 289.

Nor does § 289's reference to the infringer's "total profit" suggest that the article of manufacture must be the entire product as sold to a consumer. (*Cf*. ECF No. 258 at 16.) The only reasonable reading of § 289 is that "total profit" refers to all of the

profit from the sale of the article of manufacture, irrespective of whether the article of manufacture is the entire product or only a component of it. If only a component is the article of manufacture, profit from that component is not somehow less than the "total profit" referenced in the statute simply because it does not also include profit from other components.

Identifying the article of manufacture as a component that is never sold separately from the entire product admittedly raises certain of the practical evidentiary problems that spurred Congress's reaction to *Dobson v. Hartford Carpet Co.*, 114 U.S. 439, 445 (1885), and led to the enactment of § 289. But *Samsung* does not represent a resurrection of *Dobson* and a return to the apportionment scheme Congress rejected.

Courts have long recognized that patent holders may have a difficult time identifying the profits subject to disgorgement when the design is applied to an article of manufacture that is not independently offered for sale. *See Bush & Lane Piano Co. v. Becker Bros.*, 234 F. 79, 83 (2d Cir. 1916) (discussing method for assessing profits related to a component); *see also id*. at 85 (Ward, J., dissenting) (referring to method for *12 determining profits "purely arbitrary" and concluding that, because plaintiff cannot prove the infringer's profits, plaintiff should receive only the $250 statutory award); *Young v. Grand Rapids Refrigerator Co.*, 268 F. 966, 974 (6th Cir. 1920) (concluding that, despite an inability to prove profits associated with the handle to which the patented design element was applied, the patent holder was not entitled to recover all profits earned by defendant as a result of sales of refrigerators to which the infringing handles were attached).

But the court rejects the notion that difficulties a patent holder might have in identifying profits from something less than the entire product, by itself, supports the conclusion that the entire product is the article of manufacture. It is true that

some of the factors that are relevant in determining what is the article of manufacture might be the same as those that lead to difficulties in identifying the profits from a component. But if the obstacle is so great as to generally deny patent holders the relief that Congress intended in enacting § 289, it is up to Congress to amend the law, just as it did in response to *Dobson*. Or Congress could conclude the scheme is unworkable and eliminate disgorgement of an infringer's profits as a remedy, as it did in 1946 with respect to utility patents, *see* 1-23 Chisum on Patents §§ 20.02[4], 23.05[1][d][vi] (2017). But these issues have been noted by courts for decades and Congress has not yet intervened. *13

13

Importantly, the holder of a design patent is not limited to § 289 for relief. Thus, evidentiary hurdles in proving profit from a component do not foreclose relief. A patent holder may alternatively seek relief under § 284—for example, in the form of its lost profits or a reasonable royalty. *See, e.g.*, *Catalina Lighting v. Lamps Plus*, 295 F.3d 1277, 1290 (Fed. Cir. 2002); *Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 824 n.16 (Fed. Cir. 1992); *Sel-O-Rak Corp. v. Henry Hanger & Display Fixture Corp.*, 159 F. Supp. 769, 776 (S.D. Fla. 1958). Damages under § 284 (but not § 289) may then be tripled by the court. *Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 824 (Fed. Cir. 1992).

The court finds that the four-factor test proposed by the United States as amicus in *Samsung* is appropriate, consistent with the relevant statutory law, and supported by the case law. The factors identified by Nordock are often inconsistent with *Samsung* or are not helpful in identifying the article of manufacture. Nordock is largely arguing that the Supreme Court's holding in *Samsung* is limited to products that perform a broad range of functions. Although smartphones were at issue in *Samsung*, and the Supreme Court acknowledged the broad range of functions they perform, nothing in the Court's decision suggests that its holding was limited to such multi-functional products.

This error affected many of the arguments Nordock offered as to the propriety of its proposed factors.

However, although the court rejects the factors proposed by Nordock, the court does not believe that the four factors proposed by the United States and by Systems will *14 always be the *only* factors relevant to determining the article of manufacture. As the Court of the Appeals for the Second Circuit recognized when confronting this issue over 100 years ago, each case presents its own problems and it might not be possible to articulate factors that will apply in every instance. *Bush & Lane Piano Co.*, 234 F. at 81. Rather, each design patent must be considered in context and "considered from all viewpoints, technical, mechanical, popular, and commercial." *Id.*

14

In identifying an "article of manufacture," it would seem obvious that a significant factor would be *how* the product is manufactured. The United States repeatedly noted the significance of this factor and perhaps intended it to be encompassed within its fourth factor regarding the physical relationship between the portion of the product to which the design applies and the whole product. *See* Amicus at 29, 2016 U.S. S. Ct. Briefs LEXIS 2322 at 48 (discussing the fourth factor and stating that a relevant consideration is whether "the design is embodied in a component that is manufactured separately from the rest of the product"). In its "summary of argument" the United States explicitly stated that one of the considerations relevant to determining the article of manufacture is "the manner in which the components were manufactured." Amicus at 9, 2016 U.S. S. Ct. Briefs LEXIS 2322 at 18; *see also* Amicus at 31, 2016 U.S. S. Ct. Briefs LEXIS 2322 at 51 (noting that defendant should have the burden of producing evidence as to the relevant article of manufacture in part because it has superior knowledge of "the manner in which the product is manufactured"); *15 Amicus at 32-33, 2016 U.S. S. Ct. Briefs LEXIS 2322 at 53 (arguing remand is appropriate in part because

15

petitioner had not "identified record evidence or argument concerning other factors, such as ... the manner in which the components were manufactured").

A finished product might appear to be a unitary structure, but if considered in light of how it was manufactured it might be recognizable as a collection of components. Or vice versa. Facts relating to the manufacturing process might be otherwise relevant in a myriad of ways to identifying the article of manufacture. Therefore, the court concludes that how a product is manufactured merits explicit consideration as a factor when attempting to determine what is the relevant article of manufacture.

### c. Identifying the Article of Manufacture

Identifying the article of manufacture is generally for the jury. *See* Amicus at 9, 16, 25-28, 2016 U.S. S. Ct. Briefs LEXIS 2322 at 18, 28-29, 43-44, 46-48. But, as with other jury questions, summary judgment may be appropriate if there is no genuine dispute of material fact or if there is only one conclusion that a reasonable jury could reach. Upon reviewing the record as a whole, paying particular attention to the parties' present submissions, the court concludes it is unable to identify the article of manufacture. The question must be decided by the finder of fact.

The 'D754 Patent claims "[t]he ornamental design of a lip and hinge plate for a dock leveler ...." Other dock levelers may have a lip and hinge plate but use a simple *16 tubular or piano hinge. (ECF Nos. 164 at 91; 230 at 25.) The 'D754 Patent claims a lip and hinge plate that uses what is often referred to as a lug hinge (*see* ECF Nos. 164 at 31; 222 at 11). According to Nordock's CEO, combining the open lug hinge with the header plate made Nordock's design unique. (ECF No. 230 at 60.) As depicted in Figure 1 of the 'D754 Patent, shown below, each lug hinge is comprised of a pair of elements, one attached to the lip and one attached to the hinge plate. A rod runs through the elements, allowing rotation along an axis. (*See*

*also* ECF No. 258-5 at 23, 8:14-52 (description of dock leveler contained in U.S. Patent No. 6,834,409.)

FIG. 1

Image materials not available for display.

The 'D754 Patent clearly states that the claimed lip and hinge plate is "for a dock leveler." The patent partially depicts the dock leveler. There is no evidence that Systems *17 ever sold an infringing dock leveler without a lip and hinge plate. (*See* ECF No. 258-1, ¶¶ 49-50.) Conversely, "there [is] no evidence that Systems sold a 'lip and hinge plate' separate from the leveler as a complete unit." *Nordock*, 803 F.3d at 1355. A dock leveler is generally unable to perform its intended function without a lip. (ECF No. 258-1, ¶¶ 17, 51; ECF No. 164 at 64.) And because it is welded to the dock leveler, repair or replacement of only the lip and hinge plate would be difficult or impractical. (ECF No. 258-1, ¶ 52.)

Nonetheless, in light of the Supreme Court's conclusions in *Samsung*, even accepting these facts as true does not *necessarily* mean that the entire dock leveler is the article of manufacture. Much more important in light of *Samsung* is the fact that the patented design element relates to only a portion of the overall product. Depicted here is a complete dock leveler. The lip and hinge plate constitutes only the uppermost segment.

Image materials not available for display. (ECF No. 264, ¶ 8 (depicting Systems's infringing dock leveler).) *18

Although not readily physically severable because the components are welded together, *Nordock*, 803 F.3d at 1355, there is evidence in the record that the lip and hinge plate is conceptually distinct from the overall dock leveler. For example, Nordock's CEO testified that there are three main components to a dock leveler - the lower portion, called the frame; the "deck or the platform"; and the "front top section" or "the lip assembly." (ECF No. 230 at 15 (trial testimony of Nordock CEO);

*see also* ECF No. 230 at 34 (same).) All components of the dock leveler must function together for it to perform its intended purpose. (*See* ECF No. 164 at 64 (testimony of Nordock CEO stating that a dock leveler would not work if any component were removed).) But that does not mean that it is not a system of conceptually distinct components in much the same way the components of an automobile are distinct but must work together to achieve the object's intended function.

The design element is relevant only to the lip and hinge plate; it has no relevance to any other component of the dock leveler. Nordock may have intended its hinge design to give the overall dock leveler a distinct look. (*See* ECF Nos. 164 at 65, 74; 230 at 15-16, 59-60.) But that does not make the entire dock leveler the article of manufacture, just as the distinct design of a piano case did not make the entire piano the article of manufacture, *Bush & Lane Piano Co. v. Becker Bros*, 222 F. 902, 904 (2d Cir. 1915).

The distinction between the lip and hinge plate and the rest of the dock leveler is evident in that the design patent depicted only the lip and hinge 19 plate (it depicted a *19 fragment of the dock leveler in the form of broken lines only to show context of the lip and hinge plate, *see* U.S. Patent and Trademark Office, Manual of Patent Examining Procedure, § 1503.02). The patent expressly states that the portions depicted by broken lines "represent environmental structure in order to show the claim in a condition of use and form no part of the claimed design." 'D754 Patent.

As to how the object is manufactured, the court has not located in the record evidence as to Systems's manufacturing methods. There is, however, evidence that *Nordock* welds and paints each component separately before it assembles the complete dock leveler. (ECF No. 230 at 15; *see also* ECF No. 230 at 77-78 (description of Nordock's manufacturing process).) And there is some reason to suspect that a Systems dock leveler

is manufactured in a similar manner. (*Cf.* ECF No. 230 at 79 (Nordock CEO's testimony that the two prior deck leveler manufacturers he worked for used a similar manufacturing process).) But the court finds it inappropriate at this stage to rely upon an assumption that Systems's manufacturing methods are the same as Nordock's.

Without knowing what the evidence might be, it is difficult to speculate how this factor might impact identifying what the article of manufacture is. Obviously, if the lip and hinge plate is manufactured as a single unit wholly distinct from any other portion of the dock leveler, such evidence would tend to support a conclusion that the lip and hinge plate is the article of manufacture. On the other hand, if Systems manufactures the lip and hinge plate in a process where there is no ready distinction from the other 20 *20 aspects of the dock leveler, that would tend to support a finding that the entire dock leveler is the article of manufacture. Or a consideration of Systems's manufacturing processes might support a finding that neither Nordock nor Systems is correct and that something other than the entire dock leveler or merely the lip and hinge plate is the article of manufacture.

In light of this evidentiary gap, as well as the general notion that determining the article of manufacture is a question for the jury rather than the court, the court must deny both of the pending motions for summary judgment.

**IT IS THEREFORE ORDERED** that the motion of Nordock, Inc., as to the article of manufacture (ECF No. 257), is **denied.**

**IT IS FURTHER ORDERED** that the motion of Systems, Inc. as to the article of manufacture (ECF No. 263), is **denied.**

**IT IS FURTHER ORDERED** that the Clerk shall set this matter for a telephonic scheduling conference to discuss further scheduling in this matter.

Dated at Milwaukee, Wisconsin this 21st day of November, 2017.

/s/ _____

WILLIAM E. DUFFIN

U.S. Magistrate Judge



# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6.3.3
### Eastern Division

Oakley, Inc.

                                                Plaintiff,

v.

                                                Case No.:
1:20−cv−02970

Honorable Manish S. Shah

The Partnerships and Unincorporated Associations
Identified on Schedule "A", et al.

                                                Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, October 26, 2020:

       MINUTE entry before the Honorable Manish S. Shah: No defendant has appeared to object to plaintiff's motion for entry of default judgment. The motion is granted. Although the information about defendants' profits and revenues is sparse and there is the possibility that the restrained funds were generated by non−infringing sales, the court concludes that plaintiff's efforts provide the best available measure of profits. Defendants' failure to appear and the evidence submitted in support of the TRO demonstrate that a permanent injunction is appropriate. Enter Default Judgment Order and terminate civil case. Notices mailed. (psm, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.